UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| REVEREND SARAH MONROE; TIM QUIGG; and APRYL OBI BOLING,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ABERDEEN, a municipal government; ERIK LARSON, Mayor of the City of Aberdeen; and KRIS KOSKI, City Engineer;<br><br>Defendants. | NO.   3:18-cv-05949<br><br>PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER<br><br>**NOTE ON MOTION CALENDAR: November 19, 2018.** |

## I.    INTRODUCTION

After the City of Aberdeen purchased a sliver of land known as the River Camp in August of this year, in September the City police "registered" many of the homeless people who had been living on the property for years in tents and crude shelters, and issued 108 "permits" to the "campers" allowing them to continue to live in the camp.  At the same time, the Mayor of Aberdeen simply decreed that unless they have first secured "written permission" from the City, no one can go onto the property for any purpose, including persons affiliated with "nonprofits and advocacy organizations interested in providing support" to the homeless people living in the camp.[1]  The Mayor further decreed that the City had posted No Trespassing

---

[1] *Declaration of Reverend Sarah Monroe*, ¶¶ 17-20 & Appendix A.

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

signs on the property and that it would "actively enforce" it's no trespassing policy against anyone who entered the property "without prior written permission."[2]  Finally, the City distributed notices that warned that any River Camp resident that allowed an "unauthorized" person to visit them might be punished with revocation of their permit and eviction from the camp.[3]

The Mayor delegated the job of creating an application form for people who seek such a permit to the City Engineer.  After the form was created, the City Engineer was also given the job of reviewing all submitted applications to see which ones should be granted.  The City Engineer is supposed to consider the applicant's avowed purpose for wanting to enter the camp and contact the homeless; whether the applicant has "credentials" from a "recognized organization"; the days and hours when the applicant proposes to schedule her visits; and whether the "services" she proposes to offer the homeless camp residents are duplicative of services that the homeless can obtain "offsite" (outside the camp).  After considering these factors, the Engineer decides whether to grant or deny the application.

Like the Jehovah's Witnesses in *Watchtower Bible Society v. Village of Stratton*, 536 U.S. 150 (2002), two of the three Plaintiffs in this case have simply refused to apply for a permit.  Apryl Boling has relatives who live in the camp, and she regularly visits her cousin and brings him firewood that he can burn to keep himself and his girlfriend warm.  She also desires to hold Native American ceremonies on the property.  Tim Quigg, a businessman whose family has operated businesses in Aberdeen for over a century, and who had been regularly visiting the homeless, bringing them supplies and paying them for small jobs, also refuses to apply for a permit.

---

[2] *Id.*, ¶¶ 19-20 & Appendix A.

[3] *Id.*, ¶¶ 21-22 & Appendix B.

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

The Reverend Sarah Monroe, an Episcopal priest who has been worshipping with the homeless, providing them with pastoral services, and visiting the camp regularly for roughly four years, *did* submit an application for a permit but it was denied.[4]  The City Engineer denied her application ostensibly because she could not specify regular days and hours when she wanted to enter the camp and contact the residents.[5]  Despite being denied a permit, and despite being afraid that she may be arrested or cited for trespassing if she is caught on the property, Reverend Monroe continues to visit her parishioners in the camp.[6]

Apryl Boling also continues to visit her relatives in the camp even though she has not been granted a "permit" to do so.[7]  Tim Quigg has refrained from continuing to visit camp residents because of the danger of being arrested.[8]

All three plaintiffs respectfully submit that the City's policy of prohibiting access to the camp residents inside the camp violates the First Amendment for two reasons:  (1) it constitutes a presumptively unconstitutional prior restraint, and (2) the permitting process lacks the constitutionally required "narrow, objective and definite standards" necessary to prevent the danger of censorship.  Plaintiff Quigg and Boling's speech is currently being restrained, and Reverend Monroe's speech is threatened by the prospect that she may be arrested at any time.  Plaintiffs ask this Court to issue a temporary restraining order prohibiting the City from enforcing its permit policy.

## II.    EVIDENCE RELIED UPON

Plaintiffs submit and rely upon the following evidence in support of this motion:

---

[4] *Id.*, ¶¶ 28-32 & Appendix C.

[5] *Id.*, ¶¶ 36-40.

[6] *Id.*, ¶¶ 46-47.

[7] *Declaration of Apryl Obi Boling*, ¶¶ 2, 4-11.

[8] *Declaration of Tim Quigg*, ¶¶ 6-7, 14.  When a person believes that he has a constitutional right to engage in conduct that is forbidden unless he has obtained a permit, "an actual arrest, prosecution or other enforcement action is not a prerequisite to challenging the law."  *Susan B. Anthony List* v. *Driehaus*, 134 S.Ct. 2334, 2342 (2014).  He need only allege an intent to engage in course of action that is arguably constitutionally protected under circumstances where there is a credible threat of prosecution if he were to go ahead with that course of action.  *Id.*

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 3
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1. Declaration of the Reverend Sarah Monroe.

2. Declaration of Tim Quigg.

3. Declaration of Apryl Obi Boling.

The facts pertinent to this motion for issuance of a temporary restraining order are fully set forth in those declarations.

### III.    ONGOING VIOLATION OF FIRST AMENDMENT RIGHTS

A.    **Requiring a permit before a speaker can go "door-to-door" to disseminate a message violates the First Amendment regardless of whether the message is religious, political, or social.**

It could not be more clearly settled that Aberdeen's requirement that people get "authorization" to go onto the land where the homeless are living violates the First Amendment. One need look no further than the decision in the *Watchtower Bible* case. There the Supreme Court held unconstitutional a village ordinance that made "going in and upon private residential property for the purpose of promoting any 'cause' without first having obtained a permit" a misdemeanor offense. *Id.* at 154.

The plaintiffs in *Watchtower* were Jehovah's Witnesses who refused to even apply for a permit. *Id* at 156. There was no charge for the permit; permits were "issued routinely after [the] applicant fill[ed] out a fairly detailed 'Solicitor's Registration Form'"; and no application had ever been denied and no permit had ever been revoked. *Id.* The Jehovah's Witnesses "explained at trial that they did not apply for a permit because they derive their authority to preach from Scripture." *Id.* at 157. They explained that "[f]or us to seek a permit from a municipality to preach we feel would almost be an insult to God." *Id.* at 158.

The Supreme Court noted that "[f]or over fifty years, the Court has invalidated restrictions on door-to-door canvassing and pamphleteering." *Id.* at 160. The fact that the restrained speech in question was religious speech was not determinative. Instead, the court explained that the ability to go "door-to-door" to communicate with people by contacting them

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER 4
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

at their homes was essential "for the dissemination of ideas." *Id.* at 162. Harkening back to its decisions in *Schneider v. State (Town of Irvington)*, 308 U.S. 147 (1939) and in *Martin v. Struthers,* 319 U.S. 141 (1943), the Court explained again that "the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people." *Watchtower*, 536 U.S. at 162. "Door-to-door distribution of circulars is essential to the poorly financed causes of little people." *Struthers*, at 146. But the freedom to go directly to people's homes to speak with them is not limited to the freedom to communicate religious messages.

> That the Jehovah's Witnesses are not the only "little people" who face the risk of silencing by regulations like the Village's is exemplified by our cases involving nonreligious speech. [Citations]. In *Thomas v. Collins*, 323 U.S. 516 (1945)], the issue was whether a labor leader could be required to obtain a permit before delivering a speech to prospective union members. After reviewing the Jehovah's Witnesses cases discussed above, the Court observed:

>> "As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly. …

>> ***"If the exercise of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order.*** So long as no more is involved than exercise of the rights of free speech and free assembly, it is immune to such a restriction. If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. *We think a requirement that one must register before he undertakes to make a pubic speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment.*"

*Watchtower Bible*, 536 U.S. at 163-64, quoting *Thomas*, 323 U.S. at 539-40 (emphasis added).

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**B.** **Requiring a permit before one can go to the door of a person's home to speak to the resident is an unconstitutional prior restraint that violates the First Amendment. Restraints on approaching people in their homes without a license have consistently been struck down.**

For First Amendment purposes, a permitting requirement is a prior restraint on speech and therefore bears a "heavy presumption against" its constitutionality." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992).[9] The notion of having to ask government for its permission to go and talk to one's neighbors is both highly offensive and highly unconstitutional:

> *It is offensive – not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so.* Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the supplicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from out national heritage and constitutional tradition.

*Watchtower Bible*, 536 U.S. at 165-66 (emphasis added).

In *Watchtower,* the Court recognized that a requirement that a person apply for a license would necessarily lead to some self-censorship and suppression of speech:

> [T]here are a significant number of persons whose religious scruples will prevent them from applying for such a license. There are no doubt other patriotic citizens, who have such firm convictions about their constitutional right to engage in uninhibited debate in the context of door-to-door advocacy, that they would prefer silence to speech licensed by a petty official.

*Id. at* 167. This observation is borne out in the present case, where two of the three plaintiffs object to having to submit an application for a permit and have refused to do so. The third plaintiff, Reverend Sarah Monroe, did submit an application which defendant Koski rejected.

---

[9] The Washington State Constitution imposes an even stricter standard. The state supreme court has held that "the language of art. I, §5 absolutely forbids prior restraints on publication" and has allowed the State "only post publication sanctions to punish the abuse of free speech rights." *Ino Ino, Inc. v. Bellevue,* 132 Wn.2d 103, 117, 937 P.2d 154 (1997). The City has not accused Monroe or Boling of abusing their free speech rights and since the permitting system went into effect, Quigg has refrained from going onto the property to speak to the residents. However, since Aberdeen's permitting system clearly violates the First Amendment, there is no need for the court to consider the state constitutional claim at this juncture.

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

In the present case, Aberdeen's permit requirement for authorization to enter the camp functions as a prior restraint in exactly the same way that the Village of Stratton's license requirement constituted a prior restraint in *Watchtower Bible.*

Although the Mayor has stated that he believes that Reverend Monroe failed to identify herself as a pastor, that statement is simply false. As the copy of her application attached to her declaration clearly shows, she *did* identify herself as a pastor.[10] Moreover, even if a person does refuse to identify himself, that cannot justify the City's prohibition against unpermitted speech. As the Supreme Court has noted, a person has the right to engage in anonymous speech. *Watchtower Bible*, 536 U.S. at 166 ("anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible.") *Accord Berger v. City of Seattle*, 569 F.3d 1029, 1038 (9th Cir. 2009) ("Registration requirements also dissuade potential speakers by eliminating the possibility of anonymous speech."). "The simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations discourages citizens from speaking freely." *NAACP v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir. 1984). Particularly in an environment where a speaker can anticipate retaliation for having espoused a cause or for having made unpopular statements, such as Plaintiff Boling, who has experienced vandalism in apparent retaliation for her expression of support for the plight of homeless people,[11] the First Amendment does not permit government to require a person who wants to speak to identify herself.

The presumptive invalidity of a prior restraint is also designed to preclude government from placing significant burdens on the exercise of freedom of speech. "Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers." *Berger*, at 1037, quoting

---

[10] *Declaration of Reverend Sarah Monroe,* ¶29.

[11] *Declaration of Apryl Obi Boling,* ¶14.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 7
(Case No. 18-cv-_____)

MON037-0001 5587399

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994). "[B]ecause of the delay caused by complying with the permitting procedures, [i]mmediate speech can no longer respond to immediate issues." *Berger*, at 1038, quoting *Richmond*, 743 F.2d at 1355. As with the ordinance at issue in *Watchtower*, the permitting scheme developed by the Mayor and City Engineer prevents a person such as Apryl Obi Boling, from spontaneously deciding that she wants to hold a sweat ceremony in the River Camp, or that she wants to go down and see her cousin this afternoon:

> [T]here is a significant amount of spontaneous speech that is effectively banned by the ordinance. A person who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit. Even a spontaneous decision to go across the street and urge a neighbor to vote against the mayor could not lawfully be implemented without first obtaining the mayor's [or in this case the City Engineer's] permission.

*Watchtower Bible*, 536 U.S. at 167.

In *Berger* the Ninth Circuit noted that prohibiting "unpermitted" speech to residents in their homes has consistently been held unconstitutional:

> As a result of the significant burden that registration requirements place on speakers, the Supreme Court has consistently struck down permitting systems that apply to individual speakers – as opposed to large groups – in the one context in which they have been put in place with some regularity, solicitation of private homes.

*Berger*, 569 F.3d at 1038, citing *Watchtower Bible, supra; Village of Schaumberg v. Citizens for a Better Environment,* 444 U.S. 620, 638-39 (1980); *Cantwell v. Connecticut*, 310 U.S. 296, 301 (1940); and *Schneider v. State*, *supra*. The residents of River Camp, though their homes be tents and somewhat crudely constructed shelters, are nevertheless living in their "homes." Thus, no government, can effectively build an invisible communication wall around them by prohibiting all but the "licensed," "authorized," or "permitted," to enter their neighborhood to communicate them. Legitimate government interests such as crime prevention and privacy

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 8
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

protection can be accomplished by less restrictive means than a permitting system. *Schaumberg*, 444 U.S. at 637; *Watchtower Bible,* 536 U.S. at 168-69.

Here, as in *Watchtower Bible, Struthers, Cantwell,* and *Schaumberg*, the City of Aberdeen's permitting scheme constitutes an impermissible prior restraint that clearly violates the First Amendment.

C.  **Laws which subject speech to the unfettered discretion of local officials, such as Aberdeen's permit requirement for entering River Camp to speak to its residents, violate the First Amendment because they allow officials to discriminate against speech based upon its content. Whether the local officials actually so discriminate is irrelevant. The mere fact that an official could so discriminate under such a discretionary law renders the law unconstitutional and the law can be ignored and challenged without first applying for a permit.**

To curtail the risk that licensing regulation is used to suppress speech, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective and definite standards to guide the licensing authority." *Forsyth County,* 505 U.S. at 131 (internal quotation marks omitted). "If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion, by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." *Id.* "It is settled by a long line of [Supreme Court precedent] that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969) (conviction reversed). *Accord Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (conviction reversed). Even a content neutral law may not vests unbridled discretion in a permitting official for do so creates the "risk that he will favor or disfavor speech based on its content." *Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002). *Accord Epona v. County*

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 9
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*of Ventura*, 876 F.3d 1214, 1225 (9thn Cir. 2017) ("a permitting scheme is not 'content-neutral' if it vests unbridled discretion in a permitting official.").

Supreme Court "decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." *Shuttlesworth*, 394 U.S. at 151. *City of Lakewood v. Plain Dealer*, 486 U.S. 750, 755-56 (1988) ("when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for and being denied, a license."); *Real v. City of Long Beach*, 852 F.3d 929, 934 (9th Cir. 2017) (plaintiff "was not required to first apply for, and then be denied, a CUP [conditional use permit] to bring this claim under a permitting system that allegedly gives city officials unfettered discretion over protected activity."); *Gaudiya Vaishnava Society v. San Francisco,* 952 F.2d 1059, 1065 (9th Cir. 1990)("a law cannot condition the free exercise of First Amendment rights on the 'unbridled discretion' of government officials.").

Moreover, when "the licensor has unlimited time within which to issue a license," as is the case with Aberdeen's regulation in this case, the risk of arbitrary suppression [of speech] is as great as the provision of unbridled discretion" and the law fails to include the necessary procedural safeguards required to render it constitutional. *FW/PBS v. City of Dallas,* 493 U.S. 215, 227 (1990) (adult bookstore licensing law held to be an unconstitutional prior restraint); *Epona*, 876 F.3d at 1226 ("failure to provide any limitation on the time period within which a permit [to hold an outdoor wedding] must be approved further compounds the problem created by the lack of definite standards for permitting officials. [Citation]. Together these defects vest unbridled discretion on permitting officials in violation of the First Amendment.").

Finally, it does not matter that government has not actually engaged in censorship or abused its permitting power. There mere fact that it has the ability to do so is sufficient to make the permitting scheme a type of unconstitutional prior restraint. "[T]he mere existence of the

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1  licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties

2  into censoring their own speech, even if the discretion and power are never actually abused."

3  *Lakewood,* 486 U.S. at 757. *Accord Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) ("Proof of

4  an abuse of power in the particular case has never been deemed a requisite for attack on the

5  constitutionality of a statute purporting to license the dissemination of ideas . . ."); *Forsyth*

6  *County*, 505 U.S at 133 n.10 ("Facial attacks on the discretion granted a decisionmaker are not

7  dependent on the facts surrounding any particular permit decision."). *Long Beach Area Peace*

8  *Network v. Long Beach*, 574 F.3d 1011, 1019-20 (9th Cir. 2009) ("the mere existence of the

9  licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties

10  into censoring their own speech, even if the discretion and power are never actually abused");

11  *S. Oregon Barter Fair v. Jackson County*, 372 F.3d 1128, 1134-35 (9th Cir. 2004).

12  In this case, the City of Aberdeen's "Flow Chart" for processing an application for

13  permission to be on the property only contemplates two types of people who might be granted

14  permission:  people who wish to reside on the property, and people whose "Purpose is for

15  providing general aid or assistance to those living on property."[12]  What constitutes "aid" or

16  "assistance" is not defined.  For example, if Reverend Monroe wishes to go onto the property

17  to lead prayer, to worship, or to sing hymns, does that qualify as desiring to give "aid or

18  assistance"?  Is comforting the sick a form of "aid or "assistance"?  What about Ms. Boling's

19  desire simply to visit her cousin in order to say hello and catch up on family news?  Presumably

20  that is not a form of "aid or assistance."  Significantly, after specifically mentioning the

21  provision of food and medical aid, the City's flow chart states, ""All other purposes denied."

22  This suggests that the City has decided that political speech, religious speech, social chatter,

23  and family gossip, are all deemed too insignificant to warrant permission to enter the property.

24  On the other hand, arguably the need to provide "last rites" will be deemed a permissible form

25

26  _____

[12] *See Declaration of the Reverend Sarah Monroe,* Appendix E.

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER 11
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

of aid or assistance, whereas the need to sing spiritually uplifting hymns will be denied the status of 'aid or assistance."

The Public Works Director or his designee is instructed to consider whether the applicant "has credentials with a recognized organization or agency." There is no definition of what constitutes a "recognized" organization or agency. Presumably Plaintiff Boling does not qualify as a person "credentialed" by a recognized organization even though she has relatives living in the Camp. However, it is conceivable that as an enrolled member of the Quileute Tribe the City Engineer might view her as "credentialed" by a "recognized" organization. But whether the Tribe is a recognized organization, and whether the organization must be one that provides aid or assistance, is left up to the unfettered discretion of the person processing the application.

The Public Works Director is instructed to "make" a "determination" of whether the "services" to be provided "duplicate those provided offsite." This would seem to leave it up to the Public Works Director to decide whether he can deny Reverend Monroe a permit because Camp residents can leave the camp and go elsewhere to attend Episcopal Church services. The Mayor seems to have already decided that religious services, and most, if not all, Native American ceremonies, can be performed offsite, thus raising the question of whether tribal representatives of the Quinault and Quileute Tribes can be denied a permit. Can Tim Quigg be denied a permit because providing transportation to places like restaurants is, by definition, a service that is provided offsite?

The Public Works Director is to consider, "If multiple orgs provide the same service are they coordinating?" Does the applicant "have [a] detailed work plan"? What does "detailed" mean? If the applicant is someone like Boling who is applying for a permit "for contacting a family member or person believed to be in danger," does that mean desiring to contact a family member who is *not* in danger is *not* a permissible purpose? In danger of what? How much danger does the person have to be in for an applicant to be approved to visit? Is the need for

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER 12
(Case No. 18-cv-_____)

MON037-0001 5587399

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

firewood to keep warm urgent enough to warrant a permit if the applicant cannot show some quantifiable degree of danger that someone will freeze to death without the firewood? In sum, it is clear that the City lacks "'narrow, objective and definite standards to guide the licensing authority" that are constitutionally required by cases like *Forsyth* and *Shuttlesworth*.

When a local ordinance purports to vest a municipal official with the unfettered discretion to deny a person the freedom to speak on the ground that it seems advisable to the local official to do so, the person denied is entitled to injunctive relief that precludes the enforcement of such a law. This has been clear at least since *Hague v. Committee for Industrial Organization*, 307 U.S. 496 (1939) decided nearly over 80 years ago. There, in affirming the lower court's ruling that the town ordinance was "void upon its face," because it vested the city's "Director of Safety to refuse a permit on his mere opinion" that denying permission to speak would prevent disturbances and disorderly public assemblies, thereby empowering the Director to engage in the arbitrary suppression of unpopular views. *Hague,* 307 U.S. at 516. The Supreme Court held that the plaintiffs were entitled to an injunction against enforcement of the law, and actually enlarged the scope of the injunction that the lower court had granted holding that the plaintiffs were not required to apply for a permit at all:

> Although the court below held the ordinance void, the decree enjoins the petitioners as to the manner in which they shall administer it. There is an initial command that the petitioners shall not place "any previous restraint" upon the respondents in respect of holding meetings provided they apply for a permit as required by the ordinance. This is followed by an enumeration of the conditions under which a permit may be granted or denied. We think this is wrong. As the ordinance is void, the respondents are entitled to a decree so declaring and an injunction against its enforcement by the petitioners. ***They are free to hold meetings without a permit and without regard to the terms of the void ordinance.*** The courts cannot rewrite the ordinance, as the decree, in effect does.

*Hague*, 307 U.S. at 518 (emphasis added).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 13
(Case No. 18-cv-_____)

MON037-0001 5587399

CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

**D. The Plaintiffs' right to speak to residents of River Camp includes the correlative right of residents to receive their messages. Government cannot use the law against trespassing as a means of preventing speakers from reaching residents.**

The right to enter upon private land in order to speak to persons residing on that land is well established. In the present case, the City of Aberdeen, as the owner of the land in question, asserts the right to prohibit people who did not have authorization from the City Engineer from going onto River Camp land to talk with the homeless people who live there. In *State v. Fox,* 82 Wn.2d 289, 510 P.2d 230 (1973), migrant farm workers who had come to Washington from Texas to work on a farm were living in the Rogers Labor Camp, in worker housing provided to them by Rogers Walla Walla, Inc. (hereafter "Rogers"), a corporation engaged in farming. *Id.* at 291. The only telephone in the camp was located in the company office, and any worker who wanted to use the telephone had to seek company permission to do so. *Id.* The workers were transported to the fields where they worked in company vehicles. *Id.*

Michael Fox, an attorney employed by the Seattle-King County Legal Aid Bureau, and Guadalupe Gamboa, a labor organizer employed by the United Farm Workers Organizing Committee, went to the farm to visit with the workers residing there. They were accompanied by a journalist and a photographer. Id. at 292. Turning off a public road, they drove "past a 'No Trespassing' sign and proceed up a dirt road between an eighth and a quarter of a mile to the camp. *Id.* Fox was confronted by Bernard Lang, a Rogers employee who asked "if he had the permission of the company to be present, and whom he wished to see." *Id.* "Fox stated he did not need permission to be present and was not required to state whom he wished to see." *Id.* After confirming that they did not have company permission to be present, Lang told Fox they had to leave, but Fox remained on the premises. *Id.* Lang called the sheriff's office and two deputy sheriffs came and told Fox and Gamboa to leave. *Id.* When they refused to leave they were both arrested. *Id.*

Fox and Gamboa were both charged, tried and convicted of trespass, and they appealed to the Washington Supreme Court. *Id.* at 290. The Supreme Court held that even though the

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 14
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Rogers company did not want them to come onto the land to talk to their workers, "upon the authority of modern constitutional, decisional and statutory law, we hold the appellants [Fox and Gamboa] had a lawful right to be at the labor camp at the time they were arrested. They committed no crime and therefore the judgment of conviction is hereby reversed and the charges against appellants are dismissed." *Id.* at 294.

"With regard to Fox" the Court held that "many cases" recognized that "First and Fourteenth Amendment rights include the right to counsel." *Id.* at 293. Since "Fox merely remained on Rogers' premises and waited for Gamboa to find the men who wished to talk to him, . . . Fox had a lawful right to be there." *Id.* "With regard to Gamboa," the Court held that "the law is clear that a union organizer has the right to go where necessary to meet with workers, as long as his exercise of that right is reasonable. The right here was exercised outside of working hours and during the daytime," and thus Gamboa had a lawful right to be there. *Id.*

In this case, the First Amendment explicitly recognizes the right to freedom of religious exercise. Thus, Reverend Monroe has a recognized First Amendment right to practice her faith by going to River Camp to provide pastoral care for homeless people residing there. The Supreme Court has long recognized that the First Amendment right to speak includes a correlative right of listeners to hear the speaker's message. "[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Board of Educ. v. Pico*, 457 U.S. 853, 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). "This right is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution . . ." *Id. Accord Martin v. Struthers*, 319 U.S. at 143 ("The right of freedom of speech and press ... embraces the right to distribute literature, and necessarily protects the right to receive it."); *Virginia State Bd. Of Pharmacy v. Virginia*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both."); *Conant v.* Walters, 309 F.3d 629, 643 (9th Cir. 2002) ("It is well established that the right to hear—the right to receive

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 15
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

information—is no less protected by the First Amendment than the right to speak.")
(government enjoined from prohibiting doctors from recommending use of marijuana to
patients even though marijuana possession was illegal); "*Monteiro v. Tempe Union High Sch.
Dist.*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1998). "The dissemination of ideas can accomplish
nothing if otherwise willing addressees are not free to receive and consider them. It would be a
barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster
General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

"More importantly, the right to receive ideas is a necessary predicate to the *recipient's*
meaningful exercise of his own rights of speech, press, and political freedom." *Pico*, 457 U.S.
at 867. Finally, the right to deliver messages directly to the front "door" – or in this case the
tent entrance or makeshift shelter, is particularly important: "[D]oor to door campaigning is
one of the most accepted techniques of seeking popular support, while the circulation of
nominating papers would be greatly handicapped if they could not be taken to the citizens in
their homes." *Struthers*, 319 U.S. at 146. Thus, the residents of River Camp have a First
Amendment right to receive both Reverend Monroe's religious messages, and the nonreligious
messages which Monroe, Boling and Quigg wish to convey.

E.    **Because the permit regulation is overbroad, the Plaintiffs have standing to raise
      violations of the residents' First Amendment rights as well as the violation of their
      own free speech rights.**

"The plaintiff generally must assert his own legal rights and interests and cannot rest his
claim to relief on the legal rights or interests of third parties." *Maryland v. Joseph H. Munson
Co., Inc.*, 467 U.S. 947, 955 (1984) quoting *Warth v. Seldin*, 433 U.S. 490, 499 (1975). But
"when there is a danger of chilling free speech," the normal rule is outweighed by society's
interest in having the statute challenged and litigants "are permitted to challenge a statute not
because their own rights of free expression are violated, . . . because . . . the statute's very
existence may cause others not before the court to refrain from constitutionally protected speech

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

or expression." *Munson*, at 956-57. A statute is overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). In the present case, Aberdeen's permit requirement applies to the every possible communication that any speaker might ever wish to personally address to a resident of River Camp. For example, if Apryl Boling wants to go onto the property to go to her cousin's tent to wish him Happy Birthday, or to tell him that his mother was diagnosed with cancer, or that Huskies beat the Cougars in the Apple Cup, she needs permit. If a Congressional candidate wishes to go to a resident's shelter to solicit his vote, he needs a permit. If an attorney from a local law firm wants to tell a resident – who has no internet connection and no phone – the date of his next court hearing, he needs a permit. If an Aberdeen citizen who lives outside the camp wants to tell a camp resident that the City Council is going to debate and vote on a proposal to evict all the residents of River Camp, she needs a permit. There can be no conceivable justification for requiring these people to seek and obtain a permit. Thus, the permit law is substantially overbroad and thus the plaintiffs can assert the violation of the First Amendment rights of these parties as well.

The law's overbreadth is clear because it applies to *anyone* who wishes to enter the River Camp to speak with the residents living there, no matter what kind of information they wish to disseminate. For example, someone may wish to disseminate the message that the Ninth Circuit recently ruled that the City of Boise violated the Eighth Amendment prohibition against cruel punishment by making it a crime for the homeless to sleep or camp on city property when no other shelter is available. *Martin v. City of Boise*, 902 F.3d 1031, 1048 (9th Cir. 2018).[13] Since the City of Aberdeen also has a law that purports to make it a crime to camp (which is statutorily defined as to live) on public property, and since the Mayor has announced

---

[13] U.S. Supreme Court decision in *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) "compels the conclusion that the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter."

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 17
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

his intention to eventually get all of the homeless campers to leave the River Camp property, news of the Ninth Circuit's ruling in the *Boise* case is precisely the kind of message that the City would like to suppress, since knowledge of their constitutional rights is likely to lead the residents of the camp to choose *not* to leave the camp. But the permit law gives the City of Aberdeen the discretionary power to deny a person who wants to disseminate this message, or any other message that the City disapproves of.

## IV.  THE CRITERIA FOR A TEMPORARY RESTRAINING ORDER ARE SATISFIED IN THIS CASE.

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Gonzalez v. Arizona*, 435 F.Supp.2d 997, 999 (D. Arizona 2006); *Lockheed Missile and Space Co., v. Hughes Aircraft*, 887 F.Supp. 1320, 1323 (N.D. Cal. 1995); *United States v. Washington*, at *1, 2017 WL 1064460 (W.D. Wash.). For purposes of the present motion, therefore, this Court must look to those criteria.

"To obtain a preliminary injunction, the moving party must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest." *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

"These two alternatives represent 'extremes of a single continuum' rather than two separate tests. Thus, the greater the relative hardship to [a plaintiff] the less probability of success must be shown." *Walczak v. EPI, Prolong, Inc.,* 198 F.3d 725, 731 (9th Cir. 1999) (citation omitted).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 18
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

## A.    Likelihood of Success

Plaintiffs need not prove his case in full; they need only demonstrate that they have a likelihood of success on the merits or that they have raised questions serious enough to require litigation. *University of Texas v Camenisch,* 451 U.S. 390, 394-95 (1981). Here, they have clearly done that; they have demonstrated that Aberdeen's permitting system is presumptively unconstitutional under the First Amendment. They have also demonstrated that the guidelines for implementing the permitting system fail to contain narrow, objective and definite standards as required by the First Amendment. "Absent such standards a licensing system will generally be invalidated as an unconstitutional prior restraint." *Harman v. City of Santa Cruz*, 261 F.Supp.3d 1031 (N.D. Cal. 2017). *See, e.g., Saia v. New* York, 344 U.S. 558, 559-61 (1948) (permitting system controlled by police chief held to be unlawful prior restraint). Under these circumstances, preliminary injunctions against enforcement of municipal ordinances or rules providing for the licensing of speech are consistently granted and upheld. *See, e.g., Harman,* at 1051-52; *Gaudiya,* 952 F.2d at 1065.

## B.    Irreparable Harm

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). *Accord Citizens for Free Speech v. County of Alameda*, 62 F.Supp.3d 1129, 1142-43 (N.D. Cal. 2014); *Yvon v. City of Oceanside*, 202 F.Supp.3d 1147 (S.D. Cal. 2016).

## C.    Public interest in upholding freedom of speech

The Ninth Circuit has consistently "recognized the significant public interest in upholding free speech principles, as the ongoing enforcement of the potentially unconstitutional regulations … would infringe not only the free expression interest of [a plaintiff], but also the interests of other people subjected to the same restrictions." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009), quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 19
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

D. **Balance of equities.  No appreciable harm to the government if TRO granted.**

There are no public interests in enforcing the permitting system which outweigh the public interest in vindicating the principle of freedom of speech.  Plaintiffs Monroe, Quigg and Boling do not pose any danger of any kind to the City, and whatever legitimate interests that the City might have can easily be met by less intrusive means.  *Compare Yvon*, 202 F.Supp.3d at 1162 ("If a preliminary injunction does not issue, Yvon will be deprived of his First Amendment rights until trial on the merits.  In contrast ... there is no indication that the City has any legitimate compelling interest ... that will be adversely affected if a preliminary injunction does issue.  As such ... the balance of equities favors Yvon.")  Since Ninth Circuit "caselaw clearly favors granting preliminary injunctions to a plaintiff like Klein who is likely to succeed on the merits of his First Amendment claim" in this case the Court should grant the requested TRO. Klein, 584 F.3d at 1208.  Consequently, here as in *Harman¸ Gaudiya, Citizens for Free Speech* and *Yvon*, injunctive relief should issue.

E. **The District Court's decision to issue a TRO in the *College Republicans* case is directly on point.**

Earlier this year, in *College Republicans v. Cauce*, 2018 WL 804497 (W.D. Wash.), a university student political club sought a TRO restraining the University of Washington from enforcing its "Safety and Security protocol" by requiring the students to pay $17,000 in anticipated security costs in order to hold a "Freedom Rally."  The University did not require payment in advance of the rally, so there was no contention that the payment required functioned as a prior restraint.  However, as in the present case, the plaintiffs alleged that the University's security fee policy lacked the "narrowly drawn, reasonable and definite standards" constitutionally required in order to eliminate the unfettered discretion of university officials when deciding how much to charge for the student use of a public forum for First Amendment expression.  Citing *Forsyth County* the district court agreed with the students that the University's policy violated the First Amendment and granted the requested TRO.  The district

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 20
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

court found the students had established a likelihood of success on the merits of their First Amendment claim, had demonstrated irreparable harm would result without a TRO, and concluded that the public interest and the balance of equities favored entry of a TRO. *Id*. at *3-4. Plaintiffs submit this court should reach the same conclusion in this case.

## V.     CONCLUSION

For these reasons, Plaintiffs ask this Court to issue a temporary restraining order prohibiting the City from enforcing its policy of using the law against trespassing to preclude plaintiffs from going into the River Camp property to communicate with the homeless people who are residing there.   Plaintiffs ask the Court to restrain the Defendants from requiring anyone to apply for a "permit" or for "authorization" to enter the premises of the River Camp for the purpose of speaking to the people who are residing there.

DATED this 19th day of November, 2018.


        *s/ James E. Lobsenz*
James E. Lobsenz WSBA #8787
CARNEY BADLEY SPELLMAN, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Phone:  (206) 622-8020
Facsimile:  (206) 467-8215


        *s/ Todd Maybrown*
Todd Maybrown WSBA #18557
ALLEN HANSEN & MAYBROWN
600 University, Suite 3020
Seattle, WA 98101
Phone:  (206) 447-9681
Facsimile:  (206) 447-0839

Attorneys for Plaintiffs

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER 21
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November, 2018, I electronically filed the foregoing PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER with the Clerk of the Court using the CM/ECF system.  As noted in Plaintiff's separate CERTIFICATE OF COMPLIANCE with Fed.R.Civ.P. 65, counsel for the defendants

Ms. Patrice Kent
Corporation Counsel, City of Aberdeen
200 E. Market Street
Aberdeen, WA  98520
Tel: (360) 537-3231

agreed to accept service of Plaintiff's complaint and motion papers by email and was served by email earlier today.

DATED this 19th day of November, 2018.

_s/ Deborah A. Groth_____
Legal Assistant

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER 22
(Case No. 18-cv-_____)

MON037-0001 5587399

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020